UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 13-CR-0035 (PJS/SER) |
| Plaintiff, | |
| v. | ORDER |
| (1) JEFFREY ALLEN GARDNER and<br>(2) STUART ALAN VOIGT, | |
| Defendants. | |

  Robert M. Lewis and Kimberly A. Svendsen, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

  James E. Ostgard, II, OSTGARD LAW OFFICE, for defendant Jeffrey Allen Gardner.

  Andrew S. Birrell, GASKINS BENNETT BIRRELL SCHUPP, LLP; Joseph S. Friedberg, JOSEPH S. FRIEDBERG, CHARTERED, for defendant Stuart Alan Voigt.

  Defendant Jeffrey Gardner owned Hennessey Financial, LLC ("Hennessey"), a financing company that made subordinated loans to land-development companies (most of which were also owned by Gardner). Gardner solicited individuals to invest in Hennessey; many of those individuals were unsophisticated and had limited assets. In 2006, Gardner's land-development companies started to fail, and Hennessey began to suffer as those land-development companies defaulted on their loans. In 2008,

Hennessey collapsed, causing its investors to suffer millions of dollars in losses. Some lost their life savings.

Defendant Stuart Voigt was a friend of Gardner and the chairman of the board of directors of First Commercial Bank ("FCB"). Voigt introduced Gardner to FCB, and Gardner then persuaded FCB to loan a lot of money to Hennessey. The FCB loans were secured by Hennessey's assets, as well as by personal guaranties from Gardner. At the time that FCB made loans to Hennessey, Gardner personally owed millions of dollars to Voigt, a fact that neither Gardner nor Voigt disclosed to FCB. As Hennessey was circling the drain in 2007 and 2008, Gardner took steps to transfer Hennessey's assets to other entities that he controlled, thus depriving FCB of its collateral.

Gardner and Voigt were indicted on various fraud and other charges. A jury found Gardner guilty of four counts of mail fraud (Counts 1-4), one count of conspiracy to commit mail fraud (Count 5), four counts of bank fraud (Counts 6-9), and two counts of making a false statement in a loan application (Counts 10 and 12). ECF No. 174. The jury acquitted Gardner of a third count of making a false statement in a loan application (Count 11). ECF No. 174. The jury convicted Voigt of one count of bank fraud (Count 7) and acquitted him on a second count of bank fraud (Count 6). ECF No. 181.

This matter is before the Court on defendants' motions for judgment of acquittal and Gardner's alternative motion for a new trial. Gardner and Voigt both challenge the

sufficiency of the evidence supporting their convictions. In reviewing a challenge to the sufficiency of the evidence, the Court views the evidence in the light most favorable to the prosecution, accepting all reasonable inferences in favor of the verdict. *United States v. Gutierrez*, 757 F.3d 785, 789 (8th Cir. 2014). The Court must affirm the jury's verdict unless no reasonable juror could have convicted the defendant. *Id.*

### A. Gardner

#### 1. Counts 1-7, 10, and 12

There was ample evidence for a reasonable jury to convict Gardner of Counts 1-4 (mail fraud), Count 5 (conspiracy to commit mail fraud), Counts 6-7 (bank fraud), and Counts 10 and 12 (making false statements in loan applications). As the government thoroughly describes in its brief, the evidence at trial demonstrated that Gardner repeatedly lied to Hennessey investors; failed to disclose material facts to Hennessey investors; misappropriated investors' money for his own use; used money from new investors to make payments to existing investors; and knowingly failed to disclose substantial debts and liabilities to FCB. There was also evidence that other Hennessey employees, working in concert with Gardner, knowingly withheld material information from investors. Based on this evidence, a reasonable jury could have found that Gardner knowingly and intentionally defrauded investors, conspired to commit mail fraud, and lied to FCB.

Gardner contends that the government's evidence "is equally strong to infer innocence of the crime charged as it is to infer guilt," and thus acquittal is mandatory. *United States v. Kelton*, 446 F.2d 669, 671 (8th Cir. 1971). The premise of Gardner's argument is incorrect, however; the inferences that can be drawn from the evidence are most certainly not in equipoise. To the contrary, the evidence of Gardner's guilt was overwhelming. Because the balance of the evidence strongly favors the government, Gardner's motion to acquit on these counts must be denied. *United States v. Williams*, 647 F.3d 855, 861 (8th Cir. 2011). Similarly, because the evidence does not "preponderate[] sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the Court denies Gardner's motion for a new trial on these counts. *United States v. Malloy*, 614 F.3d 852, 862 (8th Cir. 2010) (citations and quotations omitted).

Finally, to the extent that Gardner suggests that his acquittal on Count 11 is inconsistent with a determination of guilt on any other count, the Court disagrees. To begin with, so long as there is sufficient evidence to support a conviction, seemingly inconsistent verdicts do not require acquittal. *See United States v. Opare-Addo*, 486 F.3d 414, 416-17 (8th Cir. 2007). Setting that aside, the jury's verdicts were not inconsistent. The jury was instructed that, to convict Gardner of making a false statement in a loan application, the jury had to find that Gardner made the false statement "for the purpose

-4-

of influencing the action of First Commercial Bank upon the application, extension, or increase of a loan . . ."  ECF No. 173 at 14.  Count 11 related to a personal financial statement that Gardner submitted to FCB in August 2005.  ECF No. 173 at 14.  As the government notes, the jury could—and apparently did—find that Gardner did not obtain anything as a result of that particular personal financial statement, and therefore that the financial statement was not submitted for the required purpose.

For these reasons, Gardner's motion for acquittal on Counts 1-7, 10, and 12 is denied.

### 2.  Counts 8 and 9

Gardner next attacks his convictions of bank fraud under Counts 8 and 9.  Those counts relate to what the parties call the "keeper strategy."  The keeper strategy allegedly involved transferring some of Hennessey's most valuable assets to another Gardner entity for the purpose of putting those assets out of reach of FCB, thereby rendering worthless FCB's security interest in those assets.  The Court agrees with Gardner that there is insufficient evidence of intent to defraud with respect to the keeper strategy.

The point of the keeper strategy—at least as it was originally conceived—was to enable Heritage Development Inc. ("Heritage") to pay its debts to Hennessey.  Heritage was a land-development company that Gardner owned and that was the primary

borrower from Hennessey. Trial Tr. ("TT") 349. Heritage used loans from Hennessey to purchase, plat, and develop land, after which Heritage resold the lots to builders and used the proceeds to repay its loans. TT 17. As the real-estate market cratered in 2006 and 2007, Heritage's sales dried up, and Heritage became deeply indebted to Hennessey (which, in turn, became deeply indebted to FCB and other creditors). TT 59-60, 67-69, 88-89.

Under the keeper strategy, Heritage would transfer to Hennessey those assets that the parties thought were most likely to generate income at some point in the future, thereby paying down Heritage's debt to Hennessey. TT 100. This would also benefit FCB, as FCB had a lien on Hennessey's assets, and under the keeper strategy, Hennessey would acquire additional assets. TT 579; Gov't Ex. 470 (email from FCB officer noting that, as a result of the keeper strategy, FCB would likely be paid off "due to its first lien position on [Hennessey's] assets"). Hennessey discussed this plan with FCB at various times beginning in the spring of 2007. Gov't Ex. 466, 470.

As it turned out, however, Gardner did not implement the keeper strategy as originally conceived. Heritage did transfer its most valuable assets to Hennessey, but somehow a third entity—Hennessey Financial Monthly Income Fund, LP ("MIF")—ended up with an interest in those assets. The details of this transaction are murky, in part because the government did not introduce certain key documents into

evidence.[1]  In broad outline, however, Hennessey granted MIF a security interest in its assets, including the assets that Hennessey obtained from Heritage.  *See* Gov't Ex. 97.  MIF filed a UCC financing statement claiming an interest in Hennessey's assets, Gov't Ex. 94, and MIF foreclosed upon those assets in June 2008, *see* Gov't Ex. 160.  The government contends that the filing of the UCC financing statement and the foreclosure on Hennessey's assets—both of which were done at Gardner's direction—were part of a scheme to defraud FCB out of the collateral held by Hennessey.[2]

---

[1] At trial, the Court expressed concerns about Counts 8 and 9; in particular, the Court had difficulty understanding how the keeper strategy constituted bank fraud.  In response, the government filed a memorandum defending those charges.  In that memorandum, the government cited (among other things) the September 20, 2007 agreement under which Hennessey took possession of some of Heritage's assets (Gov't Ex. 127) and the November 26, 2007 pledge agreement in which Hennessey granted MIF a security interest in all of the membership units of Heritage belonging to Hennessey (Gov't Ex. 95).  *See* ECF No. 162 at 6.  But these exhibits were never admitted into evidence at trial.  *See* ECF No. 171 at 9, 12.

[2] The Court notes that Count 8 (which charges the UCC filing) and Count 9 (which charges the foreclosure) may be multiplicitous.  *See United States v. Harris*, 79 F.3d 223, 232 (2d Cir. 1996) ("The circuits that have addressed multiplicity in the context of bank fraud consistently have held that the bank fraud statute 'punish[es] each execution of a fraudulent scheme rather than each act in furtherance of such a scheme.'" (quoting *United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir. 1994)); *see also United States v. Barnhart*, 979 F.2d 647, 651 (8th Cir. 1992) (explaining that "each execution of a scheme to defraud constitutes a separate indictable offense" and therefore "the first step in determining the number of offenses is to ascertain the contours of the scheme").  Because the Court is granting Gardner's motion for acquittal on Counts 8 and 9, however, the Court need not address this issue.

As Gardner points out, however, MIF was able to deprive FCB of its superior interest in Hennessey's assets only because FCB inexplicably failed to perfect that interest. *See* TT 606. If FCB's interest had been perfected, then MIF's UCC filing and foreclosure would have had no impact on FCB. For the jury to find that Gardner intended to defraud FCB, then, it was necessary for the jury to find that Gardner somehow knew that FCB had failed to perfect its interest. Only if Gardner knew that FCB had failed to perfect its interest would he have known that it was possible for him to deprive FCB of that interest. In the absence of such knowledge, Gardner's actions in directing the filing of the UCC financing statement and the foreclosure cannot be evidence of an intent to defraud. Yet the government cites no evidence that Gardner knew that FCB had failed to perfect its interest, and the evidence at trial was to the contrary. *See* Gov't Ex. 66 (July 2006 email attaching internal Hennessey spreadsheet that listed FCB as possessing a senior "blanket UCC" lien); Gov't Ex. 526 at 018-19 (Gardner deposition testimony that he understood FCB to have a first-priority lien on Hennessey's assets). Because there is no evidence that Gardner intended to defraud FCB by filing the UCC financing statement or conducting the foreclosure, the Court grants Gardner's motion for acquittal on Counts 8 and 9.

The Court also conditionally determines that, even if the evidence is sufficient to support a guilty verdict on Counts 8 and 9, the Court would grant Gardner a new trial

on those counts. *See* Fed. R. Crim. P. 29(d)(1). The government's evidence regarding the keeper strategy—and the government's theory for why that strategy constituted bank fraud—were extraordinarily difficult to follow, particularly against the backdrop of other transactions that were much more obviously fraudulent. Little attention was paid to the issue of whether Gardner knew that FCB failed to perfect its interest, and the Court very much doubts that the jury appreciated the significance of that issue. It would have been easy for the jury to convict Gardner on the basis that MIF's UCC filing and foreclosure seemed to be designed to cheat FCB out of its collateral, even though that would have been impossible had FCB merely undertaken the routine task of perfecting its lien. Accordingly, if the judgment of acquittal is later vacated or reversed, the Court will conduct a new trial on Counts 8 and 9.

## B. Voigt

Voigt's bank-fraud conviction is based on his role in approving an April 2006 loan increase and extension to Hennessey after Gardner failed to disclose millions of dollars in debt that he personally owed to Voigt. The only real factual dispute is whether Voigt knew that Gardner had failed to disclose the debt. As the chairman of FCB's board and a member of the loan committee, Voigt received a credit presentation that included Gardner's personal financial information. TT 505, 695; Gov't Ex. 458 at 9. At the time, Gardner owed Voigt $4.5 million, TT 1034-37, but the credit presentation

(1) said nothing about that debt and (2) claimed that Gardner's total liabilities were just under $2 million, Gov't Ex. 458 at 9.  Had Voigt read the credit presentation, he would have known that it was materially false; yet Voigt voted to approve the loan on April 11, 2006, TT 512-13, and he said nothing to anyone at FCB about the misrepresentations and omissions in Gardner's credit presentation.

Voigt highlights the lack of direct evidence that he actually read the credit presentation.  It is true that the government relied on circumstantial evidence to prove that Voigt read the credit presentation, but there is nothing unusual about using circumstantial evidence to prove a defendant's knowledge in a criminal case, and the circumstantial evidence of Voigt's knowledge was compelling.  The fact that Voigt was chairman of the board and a member of the bank's loan committee—and the fact that he was directly involved in approving the loan—is strong circumstantial evidence that he read the credit presentation.  In addition, Voigt had voted to approve an earlier loan to Hennessey after receiving a credit presentation that similarly did not disclose Gardner's debts to Voigt.  Gov't Ex. 449; TT 467, 491-92.  This evidence was sufficient to allow the jury to find that Voigt knew that Gardner was concealing his indebtedness to Voigt from FCB and that Voigt therefore intended to defraud FCB.

Like Gardner, Voigt argues that acquittal is mandatory when the inference of innocence is as strong as the inference of guilt.  *See Kelton*, 446 F.2d at 671.  Again,

though, the Court disagrees that the evidence was equally balanced. To the contrary, it hardly seems possible that Voigt—who was chairman of FCB's board and a member of the committee that approved Gardner's loans, and who had a personal financial stake in ensuring that Gardner received loans from FCB—was unaware that Gardner had failed to disclose millions of dollars in personal liability to Voigt.

Voigt also argues that there was a lack of evidence that he owed the bank a fiduciary duty to disclose what he knew about Gardner's liabilities to him. Voigt is almost certainly wrong,[3] but it does not matter. Voigt went beyond simply failing to disclose material information; Voigt actively participated in the fraudulent scheme by voting to approve the loan. Combined with the evidence that Voigt knew of Gardner's failure to disclose Gardner's liabilities to Voigt, the jury had a sufficient basis to find that Voigt aided and abetted Gardner in committing bank fraud. *See* ECF No. 173 at 15-16 (aiding and abetting instruction); *cf. United States v. Griffin*, 579 F.2d 1104, 1109 (8th Cir. 1978) (affirming conviction under 18 U.S.C. § 1014 of bank officer who participated in approving loan). It is therefore irrelevant whether Voigt owed the bank a fiduciary duty to disclose.

Finally, Voigt seems to suggest that the verdicts were inconsistent because the jury acquitted him on Count 6 but convicted him on Count 7. Voigt is incorrect. The

---

[3] Notably, Voigt conceded at trial that he owed FCB a fiduciary duty. TT 1249.

jury was instructed that, to convict Voigt on Count 6, the jury had to find that Voigt "aided and abetted Mr. Gardner's submission of a personal financial statement that did not disclose debts owed by Mr. Gardner to Mr. Voigt." ECF No. 173 at 13. By contrast, the jury was instructed that, to convict Voigt on Count 7, the jury had to find that Voigt "aided and abetted Mr. Gardner in obtaining a term extension and increase in the loan without disclosing debts owed by Mr. Gardner to Mr. Voigt." ECF No. 173 at 13. The jury could rationally find both that Voigt did nothing to aid or abet Gardner's *submission of the personal statement* at issue in Count 6 and yet that Voigt aided and abetted Gardner in *obtaining a term extension and increase in the loan* at issue in Count 7. There is nothing inconsistent about the jury's verdicts.

Voigt's motion for acquittal is denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant Jeffrey Gardner's motion for judgment of acquittal [ECF No. 207] is GRANTED IN PART and DENIED IN PART.

    a. The motion is GRANTED as to Counts 8 and 9, and Gardner is ACQUITTED of those counts.

    b. The motion is DENIED in all other respects.

2. Defendant Jeffrey Gardner's motion for a new trial [ECF No. 210] is DENIED, except that the Court will hold a new trial on Counts 8 and 9 if the Court's judgment of acquittal on those counts is vacated or reversed.

3. Defendant Stuart Voigt's motion for judgment of acquittal [ECF No. 175] is DENIED.

Dated: August 29, 2016

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge